UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| RELIASTAR LIFE INSURANCE COMPANY, § § § Plaintiff, § VS. § SUSIE ANN THOMPSON, *et al*, § § Defendants. § | CIVIL NO. M-07-140 |

RELIASTAR LIFE INSURANCE § § COMPANY, § § § Plaintiff, § § VS. § CIVIL NO. M-07-140 § SUSIE ANN THOMPSON, *et al*, § § § Defendants. §

## **ORDER ON DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT**

Now before the Court for consideration are Cross-Motions for Summary Judgment filed by Susie Ann Thompson (Doc. 21) and Humberto and Norma Gonzalez (collectively, "the Gonzalezes") (Doc. 25); both parties are Defendants in this interpleader action. For the reasons articulated below, the Court GRANTS the Gonzalezes' motion and DENIES Thompson's motion.

### I.   Background

Plaintiff ReliaStar Insurance Company ("ReliaStar") filed this interpleader action to determine the proper recipient of life insurance proceeds payable under a policy insuring the life of Norma Lozano.[1]  The Gonzalezes are Norma's parents and assert a right to the policy proceeds as Norma's nearest living relatives. Thompson brings a claim for the policy proceeds in her capacity as guardian of Nathaniel and Briana Lozano, who are the children of Guadalupe

---

[1] ReliaStar filed this action pursuant to Federal Rule of Civil Procedure 22. Diversity jurisdiction exists because Plaintiff ReliaStar is a Minnesota corporation and all defendants in this matter are from Texas. 28 U.S.C. § 1332(a). ReliaStar was dismissed from this action after agreeing to deposit the disputed insurance proceeds into the Court's registry. (Doc. 15). Although the only parties remaining are not diverse, the Court retains jurisdiction over this matter because diversity jurisdiction existed at the time the case was filed. *See Aetna Life and Casualty Co. v. Spain,* 556 F.2d 747, 749 (5th Cir. 1977).

Lozano and his only heirs. Guadalupe, who is deceased, was married to Norma at the time of her death.

The life insurance policy at issue in this case (referred to herein as "the Policy") was obtained by Guadalupe through his employer, the City of McAllen, Texas.[2] (Doc. 25 at Ex. 1 and Doc. 22 at Ex. E). Norma received life insurance coverage of $100,000 as a dependant spouse under the Policy. *Id*. The Policy designated the named employee, Guadalupe, as the beneficiary of the dependent spouse insurance coverage. (Doc. 25 at Ex. 1). The Policy provided, however, that if the employee did not survive the insured dependent either by ten days or until the date ReliaStar received notice of the insured dependent's death, then the insurance proceeds would be paid to the employee's spouse. (Doc. 22 at Ex. E at 22). If the employee's spouse was not then living, the Policy directs that the proceeds be paid to the employee's estate. (Doc. 22 at Ex. E at 22).

In this case, Guadalupe did not survive Norma for the period of time required under the Policy, as they died on the same day. Accordingly, Norma's life insurance proceeds became payable to Guadalupe's estate pursuant to the terms of the Policy. The Gonzalezes, however, argue that Guadalupe's estate is not qualified to receive the proceeds because Guadalupe murdered Norma and then committed suicide.

To support their claim, the Gonzalezes point to, among other things, the police report filed regarding Guadalupe's and Norma's deaths. That report indicates that, early on the morning of May 18, 2006, someone calling from Guadalupe's cell phone contacted the McAllen Police Department and requested that police units be sent to the Lozanos' address. Upon arriving at the location and gaining entry to the Lozanos' home, the police found both Norma and Guadalupe deceased in their bedroom. The lead detective investigating the incident, Steve

---

[2] Guadalupe was a Crime Scene Investigator with the McAllen Police Department.

Ayala, ultimately concluded that Norma was strangled to death and Guadalupe died of an apparent self-inflicted gunshot wound. (Doc. 25 at Ex. 2 at 2). Detective Ayala's report finds specifically that Guadalupe strangled Norma and then shot himself following a failed attempt to alter the crime scene to make it appear as if Norma had hanged herself. *Id.* Detective Ayala based his findings on several pieces of evidence, including: blood patterns found at the crime scene, which indicated that Guadalupe and Norma had engaged in a struggle prior to their deaths; the appearance of the wounds on both of the deceased, including wounds that suggested Norma had been beaten prior to being strangled; Guadalupe's purported suicide note, which states "I killed her and ended my life"; the autopsy reports, which found that Norma's injuries were consistent with strangulation, not hanging, and that Guadalupe's injuries were self-inflicted; and interviews with family and friends of the deceased, which revealed that Norma and Guadalupe had been having marital problems prior to their deaths and were considering getting divorced. *Id.* at 2-3.

Because Texas law forbids a person who willfully brings about the death of an insured from recovering life insurance proceeds payable on the life of the victim, the Gonzalezes argue that Guadalupe's estate is precluded from recovering the proceeds payable on Norma's life. The Policy insuring Norma lists no other contingent beneficiaries. Accordingly, the Gonzalezes claim the right to the Policy's proceeds as Norma's nearest living relatives because Texas law provides that life insurance proceeds are payable to a murder victim's nearest relatives in such circumstances.

For her part, Thompson argues that much of the evidence proffered by the Gonzalezes is inadmissible and that there is insufficient evidence to support a finding that Guadalupe willfully brought about the death of Norma. She notes specifically that Guadalupe was never convicted of

murdering Norma. Because of this, she asserts that Norma's policy proceeds should be paid to Guadalupe's estate, as it is the designated contingent beneficiary in the Policy.

## II. Standard of Review

Summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to summary judgment as a matter of law. FED. R. CIV. P. 56. A party moving for summary judgment has "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to "produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Frank v. Xerox Corp.*, 347 F.3d 130, 135 (5th Cir. 2003) (internal citations omitted). While doubts and reasonable inferences regarding the facts are resolved in favor of the non-moving party, the party's conclusory allegations, which are not supported by concrete and specific facts, will not defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## III. Analysis

### a. Applicable Texas Law

In Texas, a life insurance beneficiary who willfully brings about the death of the insured forfeits his claim to the insurance proceeds. TEX. INS. CODE § 1103.151. This is true even if the beneficiary has not been convicted of murdering the insured.[3] *See Bounds v. Caudle*, 560 S.W.2d

---

[3] Thompson argues in part that, pursuant to section 41(d) of the Texas Probate Code, a life insurance beneficiary does not forfeit the right to policy proceeds unless he is actually convicted of bringing about the death of the insured. *See* TEX. PROB. CODE § 41(d) ("No conviction shall work corruption of blood or forfeiture of estate, except in the case of a beneficiary in a life insurance policy or contract who is convicted and sentenced as a principal or accomplice in willfully bringing about the death of the insured"). Courts construing section 41(d), however, have held consistently that it is intended only to make clear that a conviction serves to *automatically* divest a felonious beneficiary of his right to life insurance proceeds; a beneficiary who willfully takes the life of the insured can still

925, 928 (Tex. 1977) (in determining whether a beneficiary willfully brought about death of insured, civil court is not bound by the outcome in an earlier criminal proceeding on the matter); *see also In the Estate of Stafford*, 244 S.W.3d 368, 370 (Tex. App.—Beaumont 2008, no pet.). Rather, a party seeking to establish that a beneficiary has forfeited the right to life insurance proceeds need only prove by a preponderance of the evidence that the beneficiary willfully brought about the death of the insured. *Medford v. Medford*, 68 S.W.3d 242, 250 n.3 (Tex. App.—Fort Worth 2002, no pet.). This may be proven by circumstantial evidence. *See Thompson v. Mayes*, 707 S.W.2d 951, 955 (Tex. App.—Eastland 1986, writ ref'd n.r.e.).

When the beneficiary of a life insurance policy is disqualified for willfully bringing about the death of the insured, Texas law provides that the contingent beneficiary named in the policy is entitled to the proceeds, so long as the contingent beneficiary is not also disqualified. TEX. INS. CODE § 1103.152. If no qualified contingent beneficiary exists under the policy, then the "nearest relative" of the insured is entitled to the policy proceeds. *Id.*

### b. Evidence Supporting Finding that Guadalupe Willfully Brought About Death of Norma

The Gonzalezes have introduced evidence into the record in support of their contention that Guadalupe willfully brought about the death of Norma. First, they provide the affidavit of Detective Steve Ayala, in which he states his finding that Guadalupe murdered Norma before killing himself, along with Ayala's police report on the incident. (Doc. 25 at Ex. 2). The police report includes Guadalupe's purported suicide note, in which he states he killed "her," presumably meaning Norma. *Id.* at Ex. B. Second, they provide Norma's death certificate, which

---

lose the right to insurance proceeds even in the absence of a conviction. *See, e.g., Aetna Life Ins. Co. v. Thomas*, No. H-06-3359, 2008 U.S. Dist. LEXIS 1013 (S.D. Tex. Jan. 7, 2008) (citing GERRY W. BEYER, 10 TEX. PRAC. SERIES § 65.3 (2007)).

lists Norma's cause of death as "asphyxia by strangulation"[4] and also states "deceased strangled by her husband." (Doc. 25 at Ex. 3).

Thompson argues that the Gonzalezes' proffered evidence is insufficient to support a finding that Guadalupe willfully brought about Norma's death. Specifically, Thompson argues that the Justice of the Peace's notation on Norma's death certificate that she was "strangled by her husband" is the conclusory statement of a non-expert and inadmissible. (Doc. 23 at 5). Further, Thompson argues that the police report concerning Norma's death, which concludes that Guadalupe killed Norma, is inadmissible because it is not properly authenticated and constitutes hearsay. *Id.* Finally, Thompson points out that the court that probated Norma's estate made no finding that Guadalupe murdered Norma and that this creates a fact issue regarding the cause of Norma's death. (Doc. 21 at 3).

The Court finds that Norma's death certificate is excepted from the hearsay rule because it is a public record. FED. R. EVID. 803(8). Further, Texas law provides that a "death certificate is prima facie evidence of the *facts* stated therein if it is certified by the state registrar." *See* TEX. HEALTH & SAFETY CODE § 191.052 (emphasis added).[5] The death certificate offered into evidence in this case is certified by the state registrar.[6] Courts interpreting section 191.052, as well as its predecessor statutes, are divided on whether certain recitations in a death certificate are "facts" within the meaning of the statute. For example, some courts will not permit into

---

[4] Norma's original death certificate did not state a cause of death because autopsy results were pending at the time it was filed. (Doc. 25 at Ex. 3). Following completion of that report, the certificate was amended to list asphyxia by strangulation as the cause of death. *Id.*

[5] Generally, the Federal Rules of Evidence govern the admissibility of evidence in diversity cases such as the instant matter. *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 280 (5th Cir. 1987). The Fifth Circuit, however, has looked to Texas state statutes and case law to determine the admissibility of death certificates in similar cases founded in diversity. *See, e.g,, Anderson v. Siemens Corp.*, 335 F.3d 466, 472 (5th Cir. 2003) (relying on Texas Health & Safety Code section 191.052, as well as cases from Texas state courts interpreting the statute and its predecessors, to hold that the district court erred in admitting into evidence a death certificate that was not certified by the state registrar); *see also Marker v. Prudential Ins. Co.*, 273 F.2d 258, 264 (5th Cir. 1959). Accordingly, this Court will do the same.

[6] Specifically, the certificate states that it is issued under the "Authority of Rule 54a, Article 4477, Revised Civil statutes of Texas." Rule 54a is the predecessor to sections 191.051 and 191.052 of the Health and Safety Code, which are the statutes governing death certificates certified by the state registrar.

evidence any statement on the certificate regarding the manner in which the death is believed to have occurred. *Compare Marker v. Prudential Ins. Co*., 273 F.2d 258, 264 (5th Cir. 1959) (original and amended death certificates' conflicting listings of manner of death as "suicide and accident were findings of fact, admissible as prima facie evidence") *with Armstrong v. Employers Cas. Co*., 357 S.W.2d 168, 172 (Tex. Civ. App.—Waco 1962, no writ) (purpose of reporting that the manner of death was "accidental, suicidal or homicidal is the compilation of vital statistics for public purposes, and not to make the conclusions admissible to show accident or suicide when these matters are at issue in civil litigation") (internal quotations and citations omitted). Nevertheless, generally a death certificate's recitation of the *cause* of death is admissible prima facie evidence. *Stroburg v. Ins. Co. of N. Am.*, 464 S.W.2d 827, 830 (Tex. 1971); *see also Gomez v. H. Yturria Land & Cattle Co.*, No. 13-03-00369-CV, 2005 Tex. App. LEXIS 6626 at *3 n.2 (Tex. App.—Corpus Christi Aug. 18, 2005, pet. denied) (noting that Texas courts have been hesitant to admit death certificates as evidence of the cause or manner of death only in regards to findings of suicide, and that even in those cases the courts are split regarding whether such findings are admissible). Of course, a death certificate is not conclusive evidence of the cause of death and is subject to explanation and rebuttal by the opposing party. *See Stroburg*, 464 S.W.2d at 830.

Based on the foregoing, the Court finds that Norma's death certificate is not admissible prima facie evidence that Guadalupe was the person who strangled her to death. That particular entry in the death certificate is not a "fact" within the meaning of section 191.052 of the Health and Safety Code. Rather, it is speculation on the part of the justice of the peace and not binding on the fact-finder in the instant matter. *See Price v. Am. Nat'l Ins. Co*., 113 S.W.3d 424, 429 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (even if the justice of the peace's notation in

death certificate that death was result of suicide was uncontradicted, "it is purely opinion evidence and is not binding on the trier of fact"). The death certificate, however, is admissible as prima facie evidence that the cause of Norma's death was "asphyxia by strangulation." *See Stroburg,* 464 S.W.2d at 830.

As for the police report offered by the Gonzalezes, it is admissible,[7] at least in part, pursuant to the public records exception to the hearsay rule. FED. R. EVID. 803(8).[8] Specifically, Rule 803(8) excepts from the hearsay rule "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ...(C) in civil actions… factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." FED. R. EVID. 803(8)(C).

In the Fifth Circuit, Rule 803(8)(C) reports are presumed to be trustworthy and admissible; therefore, it is the burden of the party opposing admission to demonstrate a lack of trustworthiness. *Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1305 (5th Cir. 1991). The trustworthiness of an 803(8)(C) report is dependent on whether "the report was compiled or prepared in a way that indicates that its conclusions can be relied upon." *Id.* at 1307; *see also id.* at 1305 (relevant factors in determining trustworthiness include, "(1) the timeliness of the investigation; (2) the special skill or expertise of the official; (3) whether a hearing was held and at what level; and (4) possible motivational problems [within the reporting entity]"). Certain

---

[7] The Court finds that Thompson's claim that the report is not properly authenticated is without merit. Attached to the report is the affidavit of Detective Steve Ayala, in which he attests that the he produced the report in the regular course of his duties as a police officer and that the report was made contemporaneously with the investigation. (Doc. 25 at Ex. 2 at 2). This is sufficient to authenticate the report. *See* Fed. R. Evid. 901; *see also Baulch v. Jones*, 70 F.3d 813, 816 (5th Cir. 1995) (autopsy report properly authenticated pursuant to Rule 901).

[8] Alternatively, the report is admissible as a business record under Rule 803(6) because it was made in the regular course of the police department's business and properly authenticated. *See United States v. Halperin*, 441 F.2d 612, 618 (5th Cir. 1971) ("Police reports are 'business records' under the Business Records Act, Title 28, U.S.C. § 1732"). The factors relevant to determining the admissibility of the police report are the same regardless of which evidentiary rule is applied. *See United States v. Oates*, 560 F.2d 45, 77 (2d Cir. 1977) ("police and evaluative reports not satisfying the standards of FRE 803(8)(B) and (C) may not qualify for admission under FRE 803(6) or any of the other exceptions to the hearsay rule").

information in a police report, however, such as witness statements offered to prove the truth of the matter asserted, are "hearsay within hearsay" and inadmissible unless each level of hearsay qualifies under one of the hearsay exceptions. *See* FED. R. EVID. 805; *United States v. Dotson,* 821 F.2d 1034, 1035 (5th Cir. 1987); *Jacobs v. City of Port Neches*, 7 F.Supp.2d 829, 835 (E.D. Tex. 1998). Moreover, an investigatory report's conclusions are not binding on the fact finder and may be disregarded. *See Mac Towing Inc. v. Am. Commercial Lines*, 670 F.2d 543, 547 (5th Cir. 1982).

In this case, Thompson has not challenged the trustworthiness of the police report offered into evidence and the Court finds there is no evidence to support a finding that it is not trustworthy. Therefore, those portions of the report that reflect Detective Ayala's first-hand observations based on his investigation and experience are admissible. *See Harris v. Browning-Ferris Industries Chemical Services, Inc*., 635 F. Supp. 1202 (M.D. La. 1986), *aff'd,* 806 F.2d 259 (5th Cir. 1986) (in action to recover damages arising out of automobile accident in which plaintiff's husband was killed, first-hand observations of police officers which were incorporated into accident report were admissible); *see also Baggett v. Burnet Consol. Sch. Dist*., No. A-06-CA-572 LY, 2007 U.S. Dist. LEXIS 71327 at *17 n.6 (W.D. Tex. Sept. 25, 2007) (police report admissible summary judgment evidence pursuant to Federal Rule of Evidence 803(8)). Ayala's report also includes the reports of the officers who first responded to the Lozano's home on May 18, 2006. Because these reports are based on the first-hand observations of each reporting officer, the factual findings contained within them are also admissible as exceptions to the hearsay rule.

The Court, however, is aware of no case, and the parties cite to none, in which the Fifth Circuit has permitted under Rule 803(8) the admission of those portions of a police report

containing the reporting officers' opinions and conclusions. Indeed, to date the Fifth Circuit has deliberately excluded such statements, even in cases where it otherwise permits admission of a police report. *See, e.g., Duhon v. Marceaux*, 33 Fed. App'x 703 (5th Cir. 2002) (unpublished) (in a civil matter, finding that the portion of a police officer's automobile accident report reflecting the officer's opinion as to who caused an accident was not admissible and noting that "this court still distinguishes between admissible findings of fact and inadmissible evaluative conclusions or opinions in official reports"). Therefore, those portions of Detective Ayala's report containing his mere opinion, including statements regarding his belief that Guadalupe strangled Norma, are not admissible.

Additionally, the Court notes that a number of witnesses' statements are included within Ayala's report. To the extent these witness statements are offered to prove the truth of the matters asserted therein, they are inadmissible hearsay within hearsay.[9] *See Dotson,* 821 F.2d at 1035. Further, Ayala's report includes a copy of Guadalupe's purported suicide note. The note states, in relevant part, "I killed her" and is signed "Lozano." Ayala's report asserts that "her" is a reference to Norma. The note, however, is inadmissible hearsay. *See United States v. Angleton*, 269 F. Supp. 2d 878, 891 (S.D. Tex. 2003) (finding such notes are not excepted from the hearsay rule under either Rule 803 or 804 nor qualify under Rule 807's residual hearsay exception). Arguably, Guadalupe's apparent admission of murder in the note is excepted from the hearsay rule as an admission against interest. *See* FED. R. EVID. 804(b)(4). However, at least one court has indicated that self-inculpatory statements made in a suicide note are not against the declarant's penal or pecuniary interests, because such concerns are "an interest of no moment to a dead man." *United States v. Lemonakis*, 485 F.2d 941, 957 n.24 (D.C. Cir. 1973).

---

[9] Moreover, the witness statements contain a further level of hearsay, as they are composed primarily of statements that Norma or Guadalupe made to each witness in the weeks prior to their deaths and those statements are being offered to prove the truth of the matter asserted.

Accordingly, the Court finds that the suicide note is not admissible to prove the truth of the matter asserted.

Therefore, in summary, the Court finds that the only admissible evidence offered in support of a finding that Guadalupe murdered Norma is: (1) Norma's death certificate, except for that portion of the certificate that asserts an opinion that Guadalupe strangled Norma, and (2) those portions of Detective Ayala's police report that set forth either his or another officer's factual findings based on their first-hand observations and investigation.

Upon review of the admissible summary judgment evidence, which is set forth in detail below, the Court finds that the Gonzalezes have demonstrated that there is no genuine issue of material fact as to whether Guadalupe willfully brought about the death of Norma.

Ayala's report states that upon arriving at the Lozano's home, officers found Guadalupe's body on his bed. (Doc. 25 at Ex. 2 at 7). One of his personal handguns was by his side and there was one spent casing from that gun lying nearby. *Id.* Officers found that eight of the gun's nine available rounds were still in the weapon. *Id.* at 9. Upon examining the body, the officers found that the wounds were indicative of a self-inflicted gunshot through the mouth. *Id.* The officers also retrieved Guadalupe's cell phone from the scene. *Id.* The last number dialed from the phone was to the McAllen Police Department's main administrative line. *Id.* Ayala's report states that at the same time the call was made from Guadalupe's phone, the police department received a call on the administrative phone line requesting that officers respond to the Lozanos' address. *Id.* Receiving calls for police assistance on that line was out of the ordinary. *Id.* Ayala, who knew the sound of Guadalupe's voice because he was a fellow officer of the McAllen Police Department, stated in his report that he listened to a recording of the call and recognized the caller's voice as that of Guadalupe. *Id.*

The report also states that Norma's body was found on the floor of the bedroom closet. *Id.* at 8. It appeared as if a closet rod had broken and the contents of the rod had fallen on top of the body. *Id.* Officers noticed ligature marks around Norma's neck and a scarf was tied around her forehead. *Id.* Additionally, the officers found blood smears in the adjacent bathroom and noted that Norma had scrapes and bruises on her legs, feet, knees and lips and that her nose appeared to be broken. *Id.* Ayala noted that these injuries indicated that Norma was involved in a struggle prior to her death. *Id.* at 24. Further, as noted above, the autopsy on Norma's body determined that the cause of her death was asphyxia by strangulation. (Doc. 25 at Ex. 3). The police officer who attended Norma's autopsy observed that the ligature marks on Norma's neck were consistent with someone who had been strangled from behind. (Doc. 25 at Ex. 2 at 36). Finally, the officers who first responded to the Lozanos' home on May 18, 2006 noted in their reports that when they arrived at the scene all of the doors and windows were secure and locked and that they had to gain entry to the house by breaking the glass door in the back of the house. *Id.* at 43.

Given this evidence, the Court finds that the Gonzalezes have met their burden of demonstrating that there is no genuine issue of material fact as to whether Guadalupe willfully brought about the death of Norma. Though the evidence presented is circumstantial, the only reasonable inference that can be drawn from it is that Norma's death was intentionally brought about by another and Guadalupe was the person who committed that offense.

Because the Gonzalezes have satisfied their burden of demonstrating that there is no genuine issue of material fact, Thompson "must go beyond the pleadings and by … affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate *specific facts* showing that there is a genuine issue for trial." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.

1994) (emphasis added and internal citations and quotes omitted). Accordingly, Thompson cannot avoid summary judgment by relying "merely upon conclusory allegations, improbable inferences and unsupported speculation." *Id.* at 1533 (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993)).

In her pleadings, Thompson points to no specific facts in the record to demonstrate that a genuine issue for trial exists. Rather, Thompson argues only that the Gonzalezes have failed to prove that Guadalupe intentionally brought about the death of Norma; as noted above, however, the Court disagrees with that contention. At the hearing on the parties' motions, Thompson's counsel suggested an alternative theory to explain Norma's and Guadalupe's deaths. Specifically, counsel argued that the Lozanos could have been attacked by a third party who may have had a grudge against Guadalupe because of his work as a crime scene investigator. This theory, however, is "unsupported speculation" and cannot serve to defeat summary judgment. *See Forsyth,* 19 F.3d at 1537. Moreover, such a theory is belied by the evidentiary record, which reveals that the Lozanos' home was locked and secure when police arrived at the scene and that there were no signs that a third party had gained entry to the home prior to the police department's arrival.

Because the Gonzalezes have demonstrated that there is no genuine issue of material fact as to whether Guadalupe willfully brought about the death of Norma, the Court finds that Guadalupe forfeited his right to the proceeds on the policy insuring Norma's life. *See* TEX. INS. CODE § 1103.152. Accordingly, pursuant to section 1103.152 of the Insurance Code, the policy proceeds must be paid to the first eligible contingent beneficiary or, if no such beneficiary is available, then to the insured's "nearest relatives." *Id*.

    c. *Disqualification of Guadalupe's Estate*

The policy insuring Norma's life provides that, if Guadalupe failed to survive Norma either by ten days or until ReliaStar received notice of Norma's death, then the policy proceeds would be paid to Guadalupe's estate.[10]  (Doc. 22 at attach. 5 at 22).   The Gonzalezes argue, however, that Guadalupe's estate cannot receive the policy proceeds because both Guadalupe *and* his estate forfeited the right to the policy proceeds when Guadalupe willfully brought about Norma's death.

The parties have cited to no Texas case, and the Court has found none on its own review, that directly addresses whether the disqualification of a beneficiary pursuant to Texas Insurance Code sections 1103.151 and 1103.152 also disqualifies the beneficiary's estate from receiving the policy proceeds when the estate is a named contingent beneficiary.  Nevertheless, numerous courts in other jurisdictions have found that when a life insurance beneficiary forfeits the right to policy proceeds by bringing about the insured's death, the beneficiary's estate is also disqualified.  *See Estate of Draper v. Commissioner,* 536 F.2d 944, 948 (1st Cir. 1976) ("That the person who commits murder, *or any person claiming under him or her*, should be allowed to benefit by his or her criminal act, would no doubt be contrary to public policy") (quoting *Cleaver v. Mutual Reserve Fund Life Ass'n*, [1892] 1 Q.B. 147 (Court of Appeal 1891)) (emphasis added); *Continental Bank & Trust Co. v. Maag*, 285 F.2d 558, 560 (10th Cir. 1960) (finding that the estate of a murderer, who committed suicide shortly after the murder, could not recover proceeds from the murder victim's life insurance policy and citing the common law rule that "a murderer *and those claiming under him* may not recover on a life insurance policy covering the life of the victim") (emphasis added); *Heinzman v. Mason*, 694 N.E.2d 1164, 1167 (Ind. Ct. App.

---

[10] The Court notes that the Policy names Guadalupe's "estate"—and not any particular individual or group—as the contingent beneficiary of the policy insuring Norma's life.  For example, if Guadalupe's children had been named specifically as contingent beneficiaries, a much different case would be presented here.  That is not the case, however, so we need not address that issue.

1998) ("even in the absence of statutory authority, a court may properly impose a constructive trust upon any property acquired by an individual *or his estate* when the individual wrongfully kills his spouse and then commits suicide before he can be charged or convicted of causing the death") (emphasis added); *Bernstein v. Rosenthal*, 671 P.2d 979, 981 (Colo. Ct. App. 1983) (where "court of competent jurisdiction finds by a preponderance of the evidence that a beneficiary of a life insurance policy [murdered] the named insured, the killer [as well as his estate] may not recover under that policy"); *Smith v. Todd*, 152 S.E. 506, 512 (S.C. 1930) (in a similar murder-suicide case, holding that the beneficiary's estate could not recover policy proceeds if the beneficiary unlawfully killed the insured). Moreover, in Texas the interests of the decedent are generally shared by his estate. *Cf. Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 787 (Tex. 2006) (noting that, generally, "a decedent's interests should mirror those of his estate"). By extension, then, any right forfeited by a decedent because of his role in willfully bringing about the death of an insured is similarly lost by his estate.

Accordingly, the Court holds that Guadalupe's estate is disqualified as a contingent beneficiary under the Policy. It is undisputed that there is no other available contingent beneficiary named in the Policy. Therefore, the policy proceeds must be paid to the insured's (Norma's) "nearest relatives" pursuant to section 1103.152 of the Texas Insurance Code. It is undisputed in this case that the Gonzalezes are Norma's nearest living relatives. Accordingly, the Policy's proceeds should be disbursed to them.

### IV. Conclusion

For the foregoing reasons, the Court GRANTS the Gonzalezes' Motion for Summary Judgment (Doc. 25) and DENIES Thompson's Motion for Summary Judgment. (Doc. 21).

SO ORDERED this 16th day of September, 2008, at McAllen, Texas.

_____
Randy Crane
United States District Judge